1

2

3

4

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

5

6

7

8

9

10

**IDALIA J. MORGUTIA-JOHNSON,**

**Plaintiff,**

**v.**

**SERGEANT LARRY HUSTEDDE AND OFFICER JEFFREY KAISER,**

**Defendants.**

**1:14-cv-127-LJO-SKO**

**MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 37)**

11

12

## I. <u>INTRODUCTION</u>

13

14

15

16

17

18

On January 28, 2014, Plaintiff Idalia J. Morgutia-Johnson ("Plaintiff") brought suit against Defendants Sergeant Larry Hustedde ("Hustedde") and Officer Jeffrey Kaiser ("Kaiser") (collectively, "Defendants") under 42 U.S.C. § 1983 ("§ 1983") on the ground they violated her civil rights during her arrest on August 24, 2010, and by subsequently charging her with various criminal offenses. *See* Doc. 1, Complaint ("Compl.") at ¶¶ 11-22. Defendants move for summary judgment on all of Plaintiff's claims against them. Doc. 37.

19

20

The Court finds it appropriate to rule on the motion without oral argument.[1] *See* Local Rule 230(g). For the following reasons, the Court DENIES the motion in its entirety.

21

## II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>[2]

22

23

24

[1] On November 6, 2014, the Court reset case deadlines, including setting the hearing deadline for any motion for summary judgment for April 15, 2015. Defendants violated that order by setting the hearing for their motion for summary judgment for April 23, 2015.

25

[2] Plaintiff filed numerous objections to Defendants' evidence and "requests that the Court rule on each of [them] before ruling on the motion for summary judgment." Doc. 52 at 1. Because the Court will consider only admissible and competent

1

**A.      Undisputed Facts.**

This case arises out of Defendants' arrest of Plaintiff on the afternoon of August 24, 2010, at Big Mama's Restaurant ("Big Mama's" or "the restaurant") in Fresno, California. UMF[3] 1. At the time, Plaintiff was a 15-year-old student at Hoover High School ("Hoover"), which is located near Big Mama's. *Id.* Although the parties have varying recollections of what transpired there between Plaintiff and Defendants, the following facts are undisputed.

Hoover students frequented Big Mama's after school. *See* Doc. 37, Ex. I, Deposition of Ebrahim Hussein ("Hussein Depo.") at 18:8-11; Doc. 37, Ex. G, Deposition of Larry Hustedde ("Hustedde Depo.") at 24:6-15. According to Ebrahim Hussein ("Hussein"), who was a manager at Big Mama's in August 2010, large groups of Hoover students frequently would meet at Big Mama's and would "go wild" in and around the restaurant. Hussein Depo. at 24:4-9 (*e.g.*, "Loud. Jumping off tables. Playing. Running. Opening doors and coming in . . . not all of them ordering food."). Hussein further testified that fights between Hoover students broke out on an almost-daily basis. *See* Hussein Depo. at 18:8-11; *see also* Doc. 37, Ex. J, Deposition of Sadiq Aljomae ("Aljomae Depo.") at 17:10-25 (Aljomae testifying that fights between Hoover students frequently happened in and around Big Mama's). Many students would "hang out" at Big Mama's without ordering anything. *See id.* at 18:21-21.

Because of Hoover students' behavior and their loitering without ordering food or drinks, Big Mama's employees frequently had to call the police. *See* Hussein Depo. at 20:3-10; *see also* Aljomae Depo. at 18:11-21. Among other things, the Fresno Police Department had received multiple reports of fights between and among Hoover students at Big Mama's, which Hustedde had witnesses on prior

---

evidence, the Court need not rule on Plaintiff's objections prior to resolving Defendants' motion for summary judgment.

[3] "UMF" stands for the parties' "undisputed material facts." The Court notes that there are recurring problems with the parties' UMFs. Specifically, many of Defendants' UMFs are not sufficiently supported (or not supported at all) by the cited evidence. *See, e.g.*, UMF 5, 9, 11, 12, 36. In addition, the parties' record citations routinely are unspecific, incomplete, or otherwise unclear.  Further, Defendants cite to evidence (namely, deposition testimony) not contained in the record. *See id.* Finally, Plaintiff makes numerous baseless objections to Defendants' UMFs and the evidence cited in support. Those objections are OVERRULED unless otherwise indicated.

1  occasions. Hustedde Depo. at 24-25. Kaiser also had talked with Big Mama's employees about these

2  problems. Doc. 37, Ex. H, Deposition of Jeffrey Kaiser ("Kaiser Depo.") at 37:3-23.

3       Because of these recurrent problems with Hoover students after school, Big Mama's instituted a

4  "no loitering policy" permitting students in Big Mama's only if they purchased something (or were in

5  the process of doing so) and were in the process of consuming it. *See* Hussein Depo. at 24:11-17. If they

6  were not purchasing or consuming something, they would be asked to leave. *Id.*

7       In the early afternoon before school let out on August 23, 2010, Hustedde met with Hussein to

8  discuss the problems associated with Hoover students gathering and loitering at Big Mama's after

9  school. Hustedde Depo. at 42:20-21. Hustedded explained to Hussein that he would be there later that

10  afternoon to help enforce the restaurant's no loitering policy, but he advised Hussein that he "wasn't

11  going to come every day and enforce [the] restaurant rules." *Id.* at 42:9-13.

12       At some point before school let out on August 24, 2010, Big Mama's posted a conspicuous sign

13  on the window near the entrance that read: "Please no loitering. Only students buying food orders

14  allowed to stay while eating or drinking at Big Mama's. We reserve the right to refuse service or ask non

15  paying customer[s] to vacate the premises." Doc. 37, Ex. C (emphasis omitted); *see also* Hustedde

16  Depo. at 42:20-43:10. Big Mama's also posted "no trespassing" signs in the parking lot. Aljomae Depo.

17  at 21:6-11.

18       Hustedde went to Big Mama's shortly before school was let out with the intention of helping to

19  enforce its no loitering policy. Hustedde Depo. at 43:10-13, 46:6-9. Shortly after school let out on

20  August 24, 2010, Plaintiff went to Big Mama's. *Id.* at 46:13-16; Doc. 50, Declaration of Idalia

21  Morgutia-Johnson ("Idalia Decl.") at ¶ 3. Plaintiff and her friends were standing in the patio area outside

22  of the restaurant when Hustedde asked them to either go inside or leave, *id.* 52:18-23; Idalia Decl. at ¶ 5,

23  so they went inside. Idalia Decl. at ¶ 6; Hustedde Depo. at 53:20-24.

24       Shortly thereafter, Hustedde went inside Big Mama's. Plaintiff and her friends were sitting at a

25  booth, and Hustedde approached them. Idalia Decl. at ¶ 6; Hustedde Depo. at 53:20-24. Plaintiff and

1   Defendants provided significantly different accounts as to what happened next.

2   **B.    Plaintiff's Version of Events.**

3       Plaintiff claims that "[o]nce inside Big Mama's, [her] friend Unique Dawson [("Unique")]

4   offered to go place our food order." Idalia Decl. at ¶ 6. Plaintiff was "sitting in the booth for a few

5   minutes waiting for [her] food order and talking with friends when [Hustedde] came up on [her] left

6   hand side." *Id.* at ¶ 7. Hustedde then "looked down at [her] direction and said words to the effect [of]

7   'you've been here too long, it's time for you to go.'" *Id.* at ¶ 8. Plaintiff "told [Hustedde] that [she] was

8   waiting for [her] order," and he then asked for her receipt. *Id.* Unique approached the booth and gave

9   Plaintiff the receipt so that she could pick up her order. *Id.* Hustedde then asked Plaintiff to get into line

10  to place a food order. *Id.* at ¶ 9. Plaintiff showed Hustedde the receipt and explained that her order

11  already had been placed and she was still waiting for it. *Id.*

12      "In response [Hustedde] said 'you don't want to listen, fine' . . . then grabbed [Plaintiff] by [her]

13  arm and yanked [her] out of the booth, slammed [her] onto the table where [she] was seated, and twisted

14  [her] right arm behind [her] back." *Id.* at ¶ 10. Hustedde then "pulled [Plaintiff] back to an upright

15  position and walked [her] out using [her] body to shove open the front door." *Id.* at ¶ 12. Once outside,

16  "Hustedde slammed [her] onto the trunk area of his patrol car." *Id.* at ¶ 13. Plaintiff felt the wind

17  knocked out of her, which caused her to fall to the ground. *Id.* Plaintiff claims that she "did not flail or

18  pull [her] arms away" or "try to break free or run away from [Hustedde]." *Id.* at ¶ 13.

19      Hustedde "then reached down and forcibly pulled [Plaintiff] off the ground by [her] pony tail and

20  upper arm." *Id.* at ¶ 14. Hustedde "wrapped his arms around [Plaintiff's] chest and breast area and held

21  [her] in a tight bear hug type hold." *Id.* at ¶ 15. Plaintiff "was freed from the hold, and [Hustedde] bent

22  over to pick up his sunglasses while holding onto [Plaintiff's] wrist." *Id.* at ¶ 18. Plaintiff claims that she

23  "did not try to escape when [she] was released from the hold." *Id.*

24      When Plaintiff was standing next to Hustedde, "out of nowhere [she] felt someone come from

25  behind without warning, and [she] felt an arm go around [her] neck in a choking motion." *Id.* at ¶ 19.

4

Plaintiff "later learned that this was done by [Kaiser]." *Id.* Kaiser had not asked Plaintiff any questions, nor did Plaintiff hear him speak with Hustedde, who was standing right next to her at the time. *Id.* Plaintiff "was not flailing [her] arms when [Kaiser] arrived and put [her] in a chokehold." *Id.* Plaintiff had difficulty breathing due to the chokehold, so she "used her hands to try to get [Kaiser] to loosen the pressure around [her] neck because she was suffocating." *Id.* Plaintiff heard Hustedde tell Kaiser to let her go because she was choking, but "[i]nstead of letting go . . . Kaiser put his hand over [her] mouth and nose," which felt like he was choking her harder. *Id.* at ¶¶ 21-22. Plaintiff began to "see[] things go white" and felt her eyes "rolling to the back of [her] head." *Id.* at ¶ 22. She "was not flailing [her] arms or trying to escape." *Id.*

The next thing that Plaintiff remembers "is sitting in [Kaiser's] patrol car with [her] knees facing outside and [her] feet on the rim of the door." *Id.* at ¶ 23. Kaiser ordered her to put her legs inside the car, but she pled with "Kaiser to leave the door open because [she] was having difficulty breathing"; however, Kaiser "put [her] legs inside the patrol car and closed the door." *Id.* Plaintiff's friends were yelling "she can't breathe" and "she needs help." *Id.* at ¶ 24. Kaiser "opened the door momentarily, looked inside, laughed, and said 'she's ok.'" *Id.* Plaintiff "do[es] not believe the air conditioner was on because [she] felt hot and was sweating while inside the patrol unit." *Id.*[4] Kaiser "did not leave the door open to allow [Plaintiff] to get more air." *Id.* at ¶ 25.

Plaintiff asserts that she "was at Big Mama's as a paying customer and was not trespassing or doing anything disruptive," and "did not resist arrest, attempt to escape, and did not hit or strike [Defendants]." *Id.* at ¶ 27. Plaintiff "was injured during the incident and [she] continue[s] to have pain from [her] injuries." *Id.* at ¶ 30.

**C.      Defendants' Version of Events.**

On August 24, 2010, Hustedde arrived at Big Mama's around 2:20 P.M., shortly before school

---

[4] The parties do not dispute that it was hot outside on August 24, 2010.

let out; Kaiser arrived sometime shortly afterward. Hustedde Depo. at 43:12-13. Hustedde noticed Plaintiff and her friends on the patio outside of the restaurant "[b]ecause she seemed to be upset" or mad at another girl due to the language she was using and how she was talking. *Id.* at 46:17-21, 50:19-23. Hustedde told Plaintiff and her friends to go inside Big Mama's and buy food or to leave. *Id.* at 52:18-22. Plaintiff and her friends went inside. *Id.* at 52:23-25.

Shortly afterward, Hustedde went inside and, at some point, he informed two Hoover students of the no loitering policy, but they refused to purchase food and refused to leave. *Id.* at 44:7-20. Hustedde therefore arrested them. *Id.*[5]

Later, Hustedde noticed that Plaintiff and her friends were sitting at a booth but had not purchased anything. *Id.* at 54:21-55:6. Hustedde informed the group of the rules at Big Mama's, to which Plaintiff replied "I ain't talking to no cop." *Id.* at 56:6-9. When Hustedde tried to address Plaintiff, she turned her back toward him. *Id.* at 57:15-19. Hustedde asked Plaintiff to show him proof of a receipt of purchasing something, which she did not do. *Id.* at 56:18-22. Plaintiff refused to talk to Hustedde. *Id.* at 57:15. Hustedde "tapped [Plaintiff] on the shoulder, and she said don't fucking touch me." *Id.* at 59:23-24.

Hustedde then said "okay, that's it . . . you're under arrest for trespassing. Get out of the booth." *Id.* at 59:24-25. Plaintiff responded: "[D]on't touch me, leave me alone, F you," so Hustedde "grabbed her left arm and pulled . . . her toward [him]." *Id.* at 60:1-3. Hustedde pulled Plaintiff "out of the booth, spun her around, and grabbed her by both of her upper arms and helper her up and started to walk her out of the restaurant backwards." *Id.* at 60:4-6.

At that time, someone came up to Hustedde, reached across the booth, and tried to hand Plaintiff a receipt, saying, "here, you can have my receipt." *Id.* at 62:8-12; *id.* at 58:10-11. This occurred approximately one to two minutes after Hustedde first approached Plaintiff at the booth. *Id.* at 57:13,

---

[5] Plaintiff denies observing Hustedde arresting the two Hoover students. Idalia Decl. at ¶ 7.

59:3-4. Hustedde replied that it was "too late" because Plaintiff "was under arrest for not following the rules; she did not have a receipt; she was not standing line; she did not have food; and . . . refused to acknowledge any of the above." *Id.* at 62:8-16.

Hustedde did not attempt to determine whether the receipt offered to Plaintiff was in fact hers or otherwise confirming that someone else had purchased something for Plaintiff. *See id.* at 58:19-22. He refused to look at the receipt because he "was physically holding [Plaintiff] and had her under arrest" by that point. *Id.* at 59:7-8.

Hustedde held Plaintiff by her upper arms and walked Plaintiff outside while holding her. *Id.* at 59:10, 62:18-19. He denied that he used Plaintiff's body to shove the front door open. *Id.* at 62:22-24.

Once outside, Hustedde attempted to handcuff Plaintiff, but she broke Hustedde's grasp on her left arm and almost lost his grasp on her right arm when Plaintiff began to run. *Id.* at 67:19-21, 69:12-13. Hustedde then "grabbed [Plaintiff's] pony tail and she collapsed . . . and fell down on the ground." *Id.* at 67:21-23. Hustedde still had a grip on Plaintiff's right arm, so he picked her back up. *Id.* at 68:24-69:2. Eventually, Hustedde held Plaintiff in a bear hug with his arms across her collar bone to restrain her because she was "putting up an active fight" by flailing her arms and trying to loosen Hustedde's grasp. *Id.* at 69:19-23, 71:8-9, 72:4-7. In addition, Plaintiff's skin was sweaty and slippery because of the heat. *Id.* at 71:12-13.

Hustedde then radioed for assistance. *Id.* at 72:12-14. When requesting assistance, Hustedde did not provide any information to dispatch as to why he needed resistance. *See id.* at 73:11-19. He did not, for instance, indicate that he was struggling with Plaintiff or that he urgently needed assistance. *Id.* at 14-19; *see also* Kaiser Depo. at 57:16-17 (Hustedde "just—he asked for another unit to assist him at Big Mama's"). By that point, Hustedde had positioned himself and Plaintiff behind his patrol car, which was parked by the curb outside Big Mama's, because of the group of Hoover students who had gathered and

1    were yelling at him. *See* Hustedde Depo. at 70:2-71:6, 73:20-21.[6] Hustedde told Plaintiff to stop fighting

2    him, he did not want to fight her, and to open the door to his patrol car and sit down. *Id.* at 75:19-21.

3    Plaintiff said something to the effect of "I'm not going in there." *Id.* at 76:2-3.

4         Hustedde then released Plaintiff from the bear hug, held her by one arm, and reached down to

5    pick up his sunglasses. *Id.* at 76:10-17. Hustedde told Plaintiff to calm down and to not fight him, and

6    explained that he was going to let her go and was only going to hold her arm. Hustedde Depo. at 76:21-

7    24. Plaintiff appeared to be compliant at that point and stopped flailing her arms. *Id.* at 77:1-3.

8         Kaiser heard Hustedde's call for assistance and headed to Big Mama's. Kaiser Depo. at 57:5-10.

9    To Kaiser, the crowd in the background on Hustedde's call sounded loud, close to Hustedde, and

10   "intense." *Id.* at 58:1-3.

11        Kaiser appeared at the scene at that time and approached from Plaintiff's left rear. Hustedde

12   Depo. at 77:14-18, 79:5-9. Kaiser observed Plaintiff standing next to Hustedde, who was holding her

13   "somewhere on the arm." *Id.* at 60:1-5. As Kaiser approached them, Hustedde told Kaiser that Plaintiff

14   was under arrest, "so [he] took her by the left arm, [with] both hands." *Id.* at 60:11-16. Plaintiff

15   "immediately yanked free of [Kaiser's] grip." *Id.* at 60:18. Although Plaintiff did not "take any

16   assaultive actions towards" Kaiser or Hustedde, *id.* at 65:5-10, Kaiser considered her to be actively

17   resisting and attempting to escape. *Id.* at 67:12-16.

18        In an effort to control Plaintiff, Kaiser grabbed her by her left wrist, placed his right arm around

19   her neck and collarbone area, his left arm around her left arm, and began to carry her away behind his

20   patrol car, which was parked next to Hustedde's. Hustedde Depo. at 79:10-80:20; Kaiser Depo. at 62:13-

21   14, 63:19-20, 65:11-15, 68:6-19. Hustedde was still holding onto Plaintiff's arm. Kaiser Depo. at 63:23-

22   25. Kaiser carried Plaintiff approximately the length of his patrol car to its trunk on the passenger side.

23   *Id.* at 79:9-20. In Kaiser's view, Plaintiff was still resisting arrest in that she was pulling at Kaiser's arm,

24   _____

25   [6] Plaintiff also submitted an approximately 2.5-minute-long video taken by a witness to the incident that shows, among other things, Hustedde restraining Plaintiff behind his patrol car and a group of approximately 10 people standing immediately next to the patrol car. *See* Doc. 38, Ex. E, Video of Incident Scene ("Video"), at 00:00:12.

trying to pull her head out of his grip, kicking at his legs, and once pushing off his patrol car in what he

perceived to be an attempt to knock him off balance. *Id.* at 81:16-82:25.

Hustedde approached Kaiser approximately thirty seconds later. Hustedde Depo. at 80:21-81:1; Kaiser Depo. at 69:13-16. Hustedde informed Kaiser that Plaintiff appeared to be choking and having difficulty breathing. Hustedde Depo. at 81:20-82:2. Kaiser stated that he was not choking her, but that Plaintiff was "pushing [his] arm into her throat." *Id.* at 82:9-10. Eventually, it appeared to Hustedde that Kaiser was not choking Plaintiff, but that she was attempting to make it look like he was doing so. *Id.* at 83:4-8. Kaiser held onto Plaintiff with his left arm to hold onto her, but he denies that he put Plaintiff in a choke hold. Kaiser Depo. at 62:7-12, 69:5-9. He "was not cutting off her air at all." *Id.* at 86:12-13. Kaiser believed Plaintiff's reaction "was a show" and that she "was playing to the crowd." *Id.* at 87:3-4.

Hustedde handcuffed Plaintiff and told Kaiser to release her. Hustedde Depo. at 84:17-19. Hustedde then "used a foot sweep to take [Plaintiff] to the ground." *Id.* at 84:21-22. Eventually, they placed Plaintiff into Kaiser's patrol car with the air conditioning on and closed the door. Kaiser Depo. at 87:14-25, 88:23-25. Kaiser did not hear Plaintiff complain that she was having trouble breathing, but did hear Plaintiff's friends say she was. *Id.* at 88:10-21. Kaiser opened the door and Plaintiff "swung her legs out onto the pavement," and stood next to the open door for two to three minutes "allowing [Plaintiff] to breathe or do whatever she needed to do." *Id.* at 89:9-12. Plaintiff remained handcuffed in the patrol car, did not try to escape, and did not say anything to Kaiser. *Id.* at 90:1-8. Kaiser then transported Plaintiff to Hoover. *Id.* at 90:9-10.

**D.    Video Evidence.**

Plaintiff submitted an approximately 2.5-minute-long video taken by a witness to Plaintiff's arrest at Big Mama's ("the video"). *See* Doc. 38, Ex. E, Video of Incident Scene ("Video"). Both parties assert that it supports their respective accounts of the incident and, in turn, contradicts the opposing party's account. *See* Doc. 48 at 7; Doc. 54 at 2. The Court has reviewed the video, which is incorporated by reference herein.  A Court-provided summary of the video, except in a general way, would rise to

1    subjective interpretation, something the Court will not do.

2    **E.    Procedural History.**

3          It is undisputed that, due to the incident at Big Mama's, Plaintiff was charged with trespassing,

4    battery on a police officer, and resisting arrest, but those charges were dropped in February 2012. *See*

5    UMF 25, 27. In addition, Plaintiff was expelled from Hoover, but was reinstated after her expulsion was

6    overturned. UMF 28.

7          Plaintiff brought this case on January 28, 2014. Compl. at 1.[7] Plaintiff brings three causes of

8    action against Defendants under § 1983.[8] Section 1983 creates a cause of action "against any person

9    acting under color of law who deprives another of any rights, privileges, or immunities secured by the

10   Constitution and laws of the United States." *Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885,

11   887 (9th Cir. 2003). Plaintiff's first cause of action against Defendants alleges that Defendants violated

12   her Fourth Amendment right to be free from unreasonable search and seizure. *Id.* at ¶¶ 26-37. Plaintiff

13   alleges that Defendants unlawfully detained and arrested her, and used unlawful excessive force in doing

14   so. *Id.* at ¶¶ 28-29.

15         Plaintiff's second cause of action is for "constitutional violations." *Id.* at 9. Plaintiff alleges that

16   Defendants violated her Fourth, Fifth,[9] and Fourteenth Amendment rights. *Id.* at ¶ 39. Specifically,

17   Plaintiff alleges that Defendants violated her right to be free "from unreasonable seizures in the form of

18   the use of excessive force by police officers . . . from a deprivation of liberty without due process of law

19   . . . and from summary punishment." *Id.* at ¶ 44.

20         Plaintiff's third cause of action against Defendants is for malicious prosecution. *Id.* at 18.

21   Plaintiff alleges that Defendants did not have probable cause to arrest and charge Plaintiff for any crime.

22   _____

23   [7] Plaintiff named as Defendants in her complaint the City of Fresno and Chief Jerry Dyer; however, Plaintiff dismissed those Defendants in March 2015. Doc. 30.

24   [8] Plaintiff brought her third and fourth causes of action against the dismissed Defendants only. *See* Compl. at 11, 15.

25   [9] Neither party mentions Plaintiff's Fifth Amendment-based allegations in their respective briefs.

1  *Id.* at ¶ 84. Plaintiff further alleges Defendants violated her Fourteenth Amendment right to due process

2  of law by falsely accusing her of committing crimes that she in fact did not commit, which led to her

3  being "wrongfully, unjustly, and falsely charged." *Id.* at ¶ 83.

4       As a result of Defendants' conduct, Plaintiff alleges she suffered and continues to suffer from

5  various emotional and physical injuries. *See id.* at ¶ 83. Among other things, Plaintiff seeks punitive

6  damages. *Id.* at ¶ 87.

7       Defendants move for summary judgment on all of Plaintiff's claims. *See* Doc. 37 at 2-3.

8  Defendants assert they are entitled to summary judgment on Plaintiff's claims because they had probable

9  cause to arrest Plaintiff, conducted a reasonable seizure of her, and did not use excessive force on her.

10  *See id.* at 2. Defendants alternatively argue that they are entitled to qualified immunity. Finally,

11  Defendants assert Plaintiff is not entitled to punitive damages because she has produced no evidence that

12  Defendants' conduct would justify punitive damages. *Id.* at 3.

13       The thrust of Plaintiff's opposition is that this case is rife with genuine issues of material fact.

14  *See* Doc. 48 at 8. Plaintiff maintains that whether Defendants lawfully arrested her, used excessive force,

15  and maliciously prosecuted are questions properly reserved for a jury. *See id.*

16  ### III. <u>STANDARD OF DECISION</u>

17       Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any

18  affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is

19  entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the

20  outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

21  (1986). A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict

22  in favor of the nonmoving party." *Id.*

23       The party seeking summary judgment "always bears the initial responsibility of informing the

24  district court of the basis for its motion, and identifying those portions of the pleadings, depositions,

25  answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

1  demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

2  (1986) (internal quotation marks omitted). The exact nature of this responsibility, however, varies

3  depending on whether the issue on which summary judgment is sought is one in which the movant or the

4  nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d

5  978, 984 (9th Cir. 2007); *Cecala v. Newman*, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007). If the movant

6  will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable

7  trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. In contrast, if the

8  nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out

9  that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex*, 477 U.S.

10  at 323).

11        If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in

12  its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a

13  jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in

14  original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see*

15  *also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the

16  moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that

17  there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record as a

18  whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue

19  for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S.

20  253, 289 (1968)).

21        In resolving a summary judgment motion, "the court does not make credibility determinations or

22  weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. That remains the province of the jury or fact

23  finder. *See Anderson*, 477 U.S. at 255. Instead, "[t]he evidence of the [nonmoving party] is to be

24  believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* Inferences, however, are not

25  drawn out of the air; the nonmoving party must produce a factual predicate from which the inference

1   may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal.

2   1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

3   

## IV. <u>ANALYSIS</u>

4   **A.     Unlawful Detention and Arrest.**

5           Plaintiff alleges she "was detained and arrested without legal cause or justification by"

6   Defendants. Compl. at ¶ 28. Plaintiff claims that, "[a]t the time of the unlawful detention and arrest,

7   [she] was a lawful patron of Big Mama's restaurant and was simply waiting for the arrival of her food

8   order." *Id.* Accordingly, Plaintiff alleges that Defendants' conduct "constituted an unlawful arrest

9   without probable cause." *Id.* at ¶ 29.

10          **1. Detention.**

11          In her opposition, Plaintiff asserts that Hustedde did not have a reasonable suspicion that

12  Plaintiff had committed a crime when he first approached her at Big Mama's. Doc. 48 at 13. Thus,

13  Plaintiff maintains that a genuine issue of material fact exists as to "whether [Hustedde] detained her

14  unnecessarily and for too long a period of time." *Id.* at 14.

15          Defendants do not address Plaintiff's detention claim in their moving papers or their reply.  They

16  do not mention Plaintiff's detention claim.  Summary judgment on the claim is Denied.

17          **2. Arrest.**

18              **a.     Probable Cause for Arrest.**

19          The Fourth Amendment requires that a warrantless arrest be supported by probable cause. *See*

20  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). "Probable cause for a warrantless arrest arises

21  when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent

22  person to believe that the suspect has committed ... an offense." *Crowe v. Cnty. of San Diego*, 608 F.3d

23  406, 432 (9th Cir. 2010) (internal quotation and citation omitted). In determining whether there was

24  probable cause to arrest, a court must look to "the totality of circumstances known to the arresting

25  officers, [to determine if] a prudent person would have concluded there was a fair probability that [the

1    defendant] had committed a crime." *Id.*

2    In most cases, in establishing probable cause, "officers may not solely rely on the claim of a

3    citizen witness that he was a victim of a crime, but must independently investigate the basis of the

4    witness's knowledge or interview other witnesses." *Arpin v. Santa Clara Valley Transp. Agency*, 261

5    F.3d 912, 925 (9th Cir. 2001). For example, the complaint in *Arpin* survived a motion to dismiss where

6    the arrestee alleged that the arresting officer "refused to identify himself, would not inform [the arrestee]

7    of the reason she was being arrested, and did not allow [her] to explain her side of the story prior to

8    arresting her." *Id.* Likewise, in *Hopkins v. Bonvicino*, 573 F.3d 752, 767 (9th Cir. 2009), an eye-witness

9    testified that Hopkins caused a minor automobile collision, his breath smelled of alcohol, he appeared

10   intoxicated, and he ran into a nearby house. On that basis, the police entered Hopkins' house to arrest

11   him. *Id.* Noting that the police failed to interview anyone else and did nothing to corroborate the

12   witness's account, the Ninth Circuit concluded that the witness's "cursory and conclusory" statements

13   "without further investigation by the police" were "insufficient to support probable cause." *Id.* However,

14   corroborating evidence is not absolutely required in every instance. Probable cause may be based upon a

15   victim's statement alone "if the victim provides facts sufficiently detailed to cause a reasonable person

16   to believe a crime had been committed and the named suspect was the perpetrator." *Peng v. Mei Chin*

17   *Penghu*, 335 F.3d 970, 978 (9th Cir. 2003) (internal quotation omitted).

18   "As a corollary ... of the rule that the police may rely on the totality of facts available to them in

19   establishing probable cause, they also may not disregard facts tending to dissipate probable cause."

20   *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) (internal quotation omitted); *see also*

21   *Merriman v. Walton*, 856 F.2d 1333, 1335 (9th Cir. 1988) (holding that even though an initial report that

22   a suspect had committed a kidnapping might have established probable cause, because the officer

23   received exculpatory information before arresting the suspect, a reasonable officer would have

24   investigated further before making the arrest); *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) ("An

25   officer need not conduct a 'mini-trial' before making an arrest, but probable cause does not exist when

1    'minimal further investigation' would have exonerated the suspect.") (internal citations omitted); *BeVier*

2    *v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("A police officer may not close her or his eyes to facts that

3    would help clarify the circumstances of the arrest. Reasonable avenues of investigation must be pursued

4    especially when ... it is unclear whether a crime had even taken place."). Yet, once probable cause is

5    established, a law enforcement officer is not "required by the Constitution to investigate independently

6    every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of

7    requisite intent." *See Baker v. McCollan*, 443 U.S. 137, 145-46 (1979) (discussing obligations of officers

8    executing a valid arrest warrant).

9                                    **b.    Analysis.**

10    Plaintiff asserts there are genuine issues of material fact as to whether Defendants had probable

11    cause to arrest her. Doc. 48 at 15. Specifically, Plaintiff argues that Defendant Hustedde did not have

12    probable cause to arrest her because he incorrectly assumed she was not a paying customer at Big

13    Mama's (and therefore trespassing and loitering), refused to listen to her explanation that a friend had

14    placed her order for her and she was waiting for it to be ready, and refused to verify her explanation with

15    her friend, who handed Def. Hustedde their receipt, which Def. Hustedde refused to examine. *Id.* at 16.

16    Thus, in Plaintiff's view, "Hustedde patently ignored information readily available to him that would

17    have instantly allayed any doubts whether his initial suspicion was correct" and he "based his decision to

18    arrest Plaintiff on less than complete information and on unreasonable suspicions." *Id.* at 18. Because

19    Plaintiff maintains she was a paying customer at Big Mama's, she asserts Defendant Hustedde cannot

20    "claim that he had probable cause to arrest her for trespassing" because he failed to "properly

21    investigat[e] whether she was a paying customer." *Id.*

22    Defendants, on the other hand, argue that Def.  Hustedde "clearly had probable cause to arrest

23    plaintiff for trespassing at Big Mama's." Doc. 37 at 14. Defendants argue that it undisputed that Plaintiff

24    was sitting at the booth without any food or drink, she refused to follow Def. Hustedde's commands to

25    either purchase something or leave, and her friend did not show a receipt to Def. Hustedde until he had

1   already arrested Plaintiff. *Id.* at 15; *see also* Doc. 54 at 7. Accordingly, Defendants assert that Def.

2   Hustedde reasonably believed Plaintiff was trespassing and, therefore, probably cause to arrest her

3   existed. *Id.* Finally, Defendants argue that Kaiser is entitled to summary judgment on Plaintiff's

4   unlawful arrest claim because "it is undisputed that [he] did not arrest plaintiff but arrived on the scene

5   pursuant to [Hustedde's] call for assistance after he had arrested plaintiff." *Id.* at 15.

6                                    **(1)      Defendant Hustedde.**

7            As discussed above, the parties present starkly different accounts as to what occurred between

8   the time when Def. Hustedde approached Plaintiff at the booth and when he arrested her. According to

9   Plaintiff, she tried to explain to Def. Hustedde that her friend Unique had ordered her food and they

10  were waiting for it, but Def. Hustedde refused to consider her explanation and arrested her without

11  determining whether her explanation was true. According to Def. Hustedde, Plaintiff refused to talk to

12  Def. Hustedde or acknowledge his commands, and did not state that her friend had bought her food for

13  which they were still waiting.

14           Viewing the evidence in the light most favorable to Plaintiff, genuine issues of material fact exist

15  as to whether Hustedde had probable cause to arrest Plaintiff for trespassing. Assuming the truth of

16  Plaintiff's testimony, Unique proffered a receipt to Def. Hustedde corroborating Plaintiff's explanation

17  as to why she was sitting at the booth without any food or drink. To have had probable cause to arrest

18  her for trespassing, Def. Hustedde must have performed at least some form of minimal investigation to

19  verify whether Plaintiff had in fact purchased something or whether she was in violation of Big Mama's

20  rules, thereby trespassing. But, according to Plaintiff's testimony, Def. Hustedde made no attempt to

21  verify whether Plaintiff had purchased something, refused to look at the proffered receipt, and

22  disregarded Plaintiff's explanation. Assuming the truth of Plaintiff's testimony, because she had

23  purchased something, she was not trespassing (or loitering). Thus, genuine issues of material fact exist

24  as to whether Def. Hustedde had probable cause to arrest her for trespassing. *See Lopez*, 482 F.3d at 1073

25  (police officers "may not disregard facts tending to dissipate probable cause"); *Hucal*, 806 F.2d at 128

("A police officer may not close her or his eyes to facts that would help clarify the circumstances of the arrest."). Accordingly, the Court DENIES Defendants' motion for summary judgment on Plaintiff's claim that Hustedde unlawfully arrested her for trespassing without probable cause.

Plaintiff, however, also was arrested and charged for resisting arrest and battery on a police officer. The record is unclear concerning the grounds for these charges. That is, the record does not indicate whether Plaintiff was charged for allegedly resisting arrest by Def. Hustedde or Kaiser (or both), nor does it indicate whether Plaintiff was charged for allegedly battering Defs. Hustedde or Kaiser (or both).

"The legal elements of a [§ 148(a)] violation . . . are as follows: (1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1329 (2002) (citations omitted). "For a § 148(a)(1) conviction to be valid, a criminal defendant must have 'resist[ed], delay[ed], or obstruct[ed]' a police officer in the lawful exercise of his duties . . . ; the lawfulness of the officer's conduct is an essential element of the offense of resisting, delaying, or obstructing a peace officer." *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005) (en banc) (citations omitted).

The crime of battery on a peace officer in violation of California Penal Code § 243(c)(2) is (1) the willful and unlawful use of force (2) upon a peace officer in the performance of his or her duties (3) by a person who knows or reasonably should know that the victim was a peace officer performing his or her duties. *See People v. Lindsay*, 209 Cal. App. 3d 849, 857 (1989).

Def. Hustedde claims—and Plaintiff denies—that Plaintiff resisted arrest.  The video is not determinative, which creates a genuine dispute of material fact as to whether Plaintiff resisted Def.

1    Hustedde's arrest.[10] Likewise, there are genuine issues of material fact as to whether Plaintiff battered

2    Def. Hustedde during her arrest. Accordingly, the Court DENIES Defendants' motion for summary

3    judgment on Plaintiff's claim that Def. Hustedde arrested her for resisting arrest and battery on a peace

4    officer without probable cause.

5                              **(2)    Defendant Kaiser.**

6              Neither party makes much of an effort to differentiate Def. Hustedde's conduct from Def.

7    Kaiser's. Plaintiff asserts that both arrested Plaintiff without probable cause. Compl. at ¶¶ 28-29; Doc.

8    48 at 19 ("Plaintiff has presented sufficient evidence to support her claim that Defendants Hustedde and

9    Kaiser wrongfully arrested her."). Defendants argue that "[i]t is undisputed that . . . Kaiser did not arrest

10   plaintiff but arrived on the scene pursuant to . . . Hustedde's call for assistance." Doc. 37 at 22.

11   Defendants contend that "[a]ny reasonable officer with . . . Kaiser's knowledge of the events would

12   believe that assistance to . . . Hustedde was supported by probable cause." *Id.*

13             Defendants' argument is somewhat ambiguous. To the extent Defendants argue that it is

14   undisputed that Kaiser arrived on the scene pursuant to Def. Hustedde's call for assistance, they are

15   correct. However, to the extent  that Defendants suggest that it is undisputed that Def. Kaiser did not

16   arrest Plaintiff because he did not arrive until Def.  Hustedde had already arrested Plaintiff, Defendants

17   are incorrect. Plaintiff argues that she "has presented sufficient evidence to support her claim that

18   Defendants Hustedde and Kaiser wrongfully arrested her." Doc. 48 at 19.

19             Based on the undisputed evidence, Def. Kaiser did not have probable cause to arrest Plaintiff *for*

20   *trespassing*. It is undisputed that Def. Hustedde did not explain why he requested assistance, and

21   although he told Def. Kaiser that Plaintiff was under arrest, there is no evidence that he explained why

22   she was under arrest. According to Def. Kaiser, he arrived at the scene, observed Officer Hustedde

23   _____

24   [10] Plaintiff appears to suggest that she cannot be charged for resisting arrest under § 148 because that provision does not make
     it a crime to resist unlawful orders." *Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012) (emphasis added)

25   (citing *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005) (en banc)).

1   holding Plaintiff with one arm, Def. Hustedde told him she was under arrest—but did not explain to him

2   why or for what crime she was under arrest—and Def. Kaiser immediately grabbed her arms to assist

3   with her arrest. Def. Kaiser therefore did not have probable cause to believe that Plaintiff had been

4   trespassing and to arrest her for doing so.[11] Accordingly, the Court DENIES Defendants' motion for

5   summary judgment on Plaintiff's claim against Def. Kaiser for arresting her for trespassing without

6   probable cause.

7       But, as discussed above, Plaintiff also was charged for resisting arrest and battery on a police

8   officer. Def. Kaiser testified—and Plaintiff denies—that when he tried to grab Plaintiff's arms to effect

9   her custody, she yanked her arms free of his grip and resisted. Def. Kaiser claims that Plaintiff forcibly

10  continued to resist arrest. According to Plaintiff, Def. Kaiser arrived at the scene unbeknownst to her,

11  did not talk to Def. Hustedde, and immediately placed his right arm around her neck and began carrying

12  her away.[12] Further, Plaintiff claims she did not resist Def. Kaiser's arresting her in any way. Thus,

13  genuine issues of material fact exist as to whether Kaiser had probable cause to arrest Plaintiff for

14  resisting arrest.[13]        Similarly, the video shows that Plaintiff was kicking and pulling at Def. Kaiser's

15  arm as he carried her away, and apparently pushed off his patrol car with her feet. In Def. Kaiser's view,

16  Plaintiff was continuing to resist arrest and, by pushing off his patrol car, attempting to knock Def.

17  Kaiser over. Plaintiff, on the other hand, claims she was not resisting arrest and suggests that she was

18  pulling at Def. Kaiser's arm because she was choking. Thus, genuine issues of material fact exist as to

19  whether Def. Kaiser had probable cause to arrest Plaintiff for battery. Accordingly, the Court DENIES

20  Defendants' motion for summary judgment on Plaintiff's claim that Def. 3Kaiser unlawfully arrested her

21

22  [11] To the extent Kaiser could have based probable cause to arrest Plaintiff for trespassing on information possessed by officer Hustedde, Kaiser would not be entitled to summary judgment because Hustedde's basis for asserting probable cause regarding any trespass violation is disputed.

23  [12] Neither party testified as to how much time elapsed between the time Hustedde released Plaintiff from restraomt until Kaiser arrived on the scene. The video is not determinative.

24

25  [13] Because Plaintiff also disputes Hustedde's claim that she forcibly resisted arrest, genuine issues of material fact also exist as to whether Hustedde had probable cause to arrest her for resisting arrest or battery on a peace officer.

1   for resisting arrest and battery on a police officer without probable cause.[14]

2   **B.   Excessive Force.**

3          Plaintiff asserts Defendants used excessive force when arresting her, in violation of her Fourth

4   and Fourteenth Amendment rights.[15] Doc. 48 at 15. Defendants maintain their use of force was

5   reasonable under the circumstances. Doc. 37 at 16.

6          Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses,

7   papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants

8   shall issue, but upon probable cause." U.S. Const. amend. IV. "The Fourth Amendment does not

9   proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."

10  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted); *see also United States v. Chan-Jimenez*,

11  125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the Fourth Amendment, a seizure occurs when a

12  law enforcement officer, by means of physical force or show of authority, in some way restrains the

13  liberty of a citizen.").

14         The Fourth Amendment requires police officers making an arrest to use only an amount of force

15  that is objectively reasonable in light of the circumstances facing them. *Tennessee v. Garner*, 471 U.S. 1,

16  7-8 (1985).  Neither tackling nor punching a suspect to make an arrest necessarily constitutes excessive

17  force. *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("'Not every push or shove, even if it may seem

18  unnecessary in the peace of the judge's chambers,' . . . violates the Fourth Amendment") (quoting

19  *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). But "even where some force is justified, the

20  amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). The

21  question in all cases is whether the use of force was "objectively reasonable in light of the facts and

22  circumstances confronting" the arresting officer(s). *Graham*, 490 U.S. at 397 (internal quotation marks

23  _____

24  [14] Plaintiff was also charged with battery on a peace officer. The record is unclear as to whom she purportedly battered.

25  [15] As noted, Plaintiff brings her excessive force claim under the Fourth, Fifth, and Fourteenth Amendments, Compl. at ¶ 39, but neither party addressed the Fifth Amendment in their briefs.

1   omitted).

2       Claims of excessive force are analyzed under an objective reasonableness standard. *Scott v.*

3   *Harris*, 550 U.S. 372, 381 (2007). Determining whether a Fourth Amendment violation has occurred

4   requires a "careful balancing" of the extent of the intrusion on the individual's Fourth Amendment rights

5   against the government's interests to determine whether the officer's conduct was objectively reasonable

6   based on the totality of the circumstances. *Graham*, 490 U.S. at 396-97; *Price v. Sery*, 513 F.3d 962, 968

7   (9th Cir. 2008); *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003).

8       This balancing requires a three-step analysis. The first step requires an assessment of the severity

9   of the intrusion on the individual's Fourth Amendment rights by evaluating "the type and amount of

10  force inflicted." *Miller*, 340 F.3d at 964; *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d

11  1052, 1056 (9th Cir. 2003). The second step requires evaluation of the government's interests by

12  assessing (i) the severity of the crime; (ii) whether the suspect posed an immediate threat to the officers'

13  or public's safety; and (iii) whether the suspect was resisting arrest or attempting to escape. *Chew*, 27

14  F.3d at 1441; *Graham*, 490 U.S. at 396. The third step requires balancing the force that was used by the

15  officers against the need for such force to determine whether the force used was "greater than is

16  reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002); *Miller*, 340

17  F.3d at 964 (a court must "balance[s] the gravity of the intrusion on the individual against the

18  government's need for that intrusion."). "Because this inquiry is fact-sensitive, summary judgment

19  should be granted sparingly." *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013)

20  (citing *Santos*, 287 F.3d at 853); *see also Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537

21  (9th Cir. 2010) ("[T]his court has often held that in police misconduct cases, summary judgment should

22  only be granted 'sparingly' because such cases often turn on credibility determinations by a jury.").

23      Defendants acknowledge that "reasonableness of a police use of force is ordinarily a question of

24  fact for the jury." Doc. 37 at 16. As the Ninth Circuit has observed, this is so because the three-step

25  balancing analysis of an excessive force claim "nearly always requires a jury to sift through disputed

1  factual contentions, and to draw inferences therefrom." *Santos*, 287 F.3d at 853.

2       As it stands, the record is rife with material factual disputes between the parties. The only

3  evidence thus far submitted concerning what transpired between Plaintiff and the two officers is their

4  testimony and the video. As outlined above, the parties' respective testimony paints irreconcilable

5  differences of what occurred.

6       Citing *Scott v. Harris*, 550 U.S. 372, Defendants argue that the video evidence corroborates their

7  version of events. *See* Doc. 54 at 6. Defendants "ask that the Court deem the videotape as the undisputed

8  facts since plaintiff's declaration is so contrary to the undisputed videotape as to be laughable" because

9  it "clearly shows plaintiff kicking [and] flailing in response[] to the officers' attempts to restrain her." *Id.*

10       Even deeming the video as undisputed evidence, it does not render the numerous disputed facts

11  undisputed. The video sheds no light on what happened leading up to Plaintiff's arrest nor does it

12  establish whether Def. Hustedde used excessive force prior to the point where the video begins. Second,

13  the video is low quality—it is grainy and shaky, at times not focused on Plaintiff and Defendants, and

14  the bystanders frequently obfuscate the view. ("In light of the factual disputes regarding the amount of

15  force used, the circumstances under which it was applied, and the extent of the plaintiffs' injuries, the

16  question is properly for the jury whether the force applied by the officers was objectively reasonable

17  under the totality of the circumstances."). Accordingly, Defendants' motion for summary judgment on

18  Plaintiff's excessive force claim is DENIED.

19  **C.   Malicious Prosecution.**

20       Plaintiff alleges that Defendants maliciously prosecuted her by, among other things, arresting her

21  without probable cause, falsifying evidence, distorting their reports, providing false declarations, and

22  recommending that she be charged and prosecuted for various offenses. Compl. at ¶¶ 81-84. As a result,

23  Plaintiff was "wrongfully prosecuted and unjustly charged" with assault on a peace officer, resisting

24  arrest, and trespassing. *Id.* at ¶¶ 83, 85.

25       Defendants move for summary judgment on Plaintiff's malicious prosecution claim on the

1  grounds that, because they had probable cause to arrest her, "they had probable cause to initiate criminal

2  proceedings against her" and Plaintiff "has produced no evidence that such criminal proceeding[s] were

3  brought with malice or bad faith." Doc. 37 at 15-16.

4          To prevail on her malicious prosecution claim, Plaintiff "must show that the defendants

5  prosecuted her with malice *and* without probable cause, and that they did so for the purpose of denying

6  her equal protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d

7  1180, 1189 (9th Cir. 1995) (emphasis added) (citations omitted). Thus, "probable cause is an absolute

8  defense to malicious prosecution." *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054-55 (9th Cir.

9  2009).

10          As discussed, genuine issues of material fact exist as to whether Defendants had probable cause

11  to arrest Plaintiff for any of the offenses for which she was charged. And because those issues remain

12  disputed, whether Defendants acted with malice also remains disputed. *See Titus v. Cnty. of Los Angeles*,

13  308 Fed. App'x 210, 212-13 (9th Cir. 2009) ("Assuming it is also found that the [malicious prosecution]

14  action was brought without probable cause, a reasonable jury could find that [the defendants] acted with

15  malice.") Accordingly, the Court DENIES Defendants' motion for summary judgment on Plaintiff's

16  malicious prosecution claim.

17  **D.**     **Qualified Immunity.**

18          Qualified immunity shields government officials "from liability for civil damages insofar as their

19  conduct does not violate clearly established statutory or constitutional rights of which a reasonable

20  person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The protection of qualified

21  immunity applies regardless of whether the government official makes an error that is "a mistake of law,

22  a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555

23  U.S. 223, 231 (2009) (internal quotation and citation omitted). "The principles of qualified immunity

24  shield an officer from personal liability when an officer reasonably believes that his or her conduct

25  complies with the law." *Id.* at 245.

1    Defendants bear the burden of proving that they are entitled to qualified immunity, *Moreno v.*

2    *Baca,* 431 F.3d 633, 638 (9th Cir. 2005), and the Court must view the evidence in the light most

3    favorable to Plaintiff as the party asserting a constitutional injury. *See Saucier v. Katz*, 533 U.S. 194,

4    201 (2001). To determine if qualified immunity applies, the Court asks (1) "whether the facts that a

5    plaintiff has . . . shown . . . make out a violation of a constitutional right," and, if so, (2) "whether the

6    right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Wilkinson v.*

7    *Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Pearson*, 555 U.S. at 232). Thus, "[t]he threshold

8    inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a

9    constitutional violation." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003).

10    Defendants maintain that they are entitled to qualified immunity on all of Plaintiff's claims.

11    Defendants contend that, "even if . . . Hustedde did not actually have clear probable cause to arrest

12    plaintiff for trespassing . . . it was certainly reasonable for [him] to believe he had probable cause and

13    thus is entitled to qualified immunity on the basis of reasonable mistake of fact." Doc. 37 at 21.

14    Defendants contend "it is undisputed that plaintiff had no food or drink when [Hustedde] approached her

15    and recited the rules and ask her to leave . . . [but] Plaintiff did not obey [his] commands." *Id.*

16    Defendants further contend that it is undisputed that it was not until "plaintiff was arrest did a third

17    party, whose testimony has not been offered by the plaintiff, place a putative receipt for food on

18    plaintiff's table." *Id.* at 22. Defendants therefore assert that Hustedde had probable cause to arrest

19    Plaintiff because he reasonably believed Plaintiff was trespassing. *Id.*

20    Plaintiff argues that Defendants are not entitled to qualified immunity on her unlawful arrest

21    claim. Doc. 48 at 25. Plaintiff claims that, because there are disputed material facts as to whether Def.

22    Hustedde had probable cause and whether any force was necessary, the Court cannot determine whether

23    Defendants are entitled to qualified immunity. *See id.* at 25-26.

24    "Where a Fourth Amendment violation is claimed, the factual issues that may preclude a

25    determination of qualified immunity on summary judgment fall into two categories." *Act Up!/Portland*

1    *v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). "First, a determination of reasonable suspicion or probable

2    cause requires an inquiry as to the facts and circumstances within an officer's knowledge . . . . These are

3    matters of fact to be determined, where genuine disputes of a material nature exist, by the fact finder."

4    *Id.* (citations and footnote omitted). Thus, whether an officer made a "'reasonable mistake' of fact or

5    law . . . may depend on the jury's resolution of disputed facts and the inferences it draws therefrom."

6    *Santos*, 287 F.3d at 855 n.12.

7            As discussed above, the parties provide drastically different accounts of why Defendants arrested

8    Plaintiff and what occurred while they did so. As a result, there are few undisputed material facts

9    concerning whether Defendants had probable cause to arrest Plaintiff and whether they used excessive

10   force in doing so.[16]

11           In other words, essentially all of the material facts underlying Plaintiff's claims are disputed. The

12   Court therefore cannot properly assess whether Defendants are entitled to qualified immunity on those

13   claims unless and until the material factual disputes have been determined by the jury. *See Cameron v.*

14   *Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013) ("The County Defendants are not entitled to qualified

15   immunity at this juncture as the record does not permit us to decide whether they violated clearly

16   established law."); *Espinosa*, 598 F.3d 528, 532 (9th Cir. 2010) ("In this case, the district court properly

17   denied the summary judgment motion because there are genuine issues of fact regarding whether the

18   officers violated [the plaintiff's] Fourth Amendment rights. Those unresolved issues of fact are also

19   material to a proper determination of the reasonableness of the officers' belief in the legality of their

20   actions."); *Santos*, 287 F.3d at 855 n. 12 (finding it premature to decide whether the officer-defendants

21   were entitled to qualified immunity "because whether the officers may be said to have made a

22   _____

23   [16] The only undisputed material facts establish that Kaiser did not have probable cause to arrest Plaintiff

24   for trespassing, and the only argument Defendants provide concerning whether Kaiser is entitled to
     qualified immunity for his involvement in Plaintiff's arrest erroneously asserts that Kaiser in fact did not

25   arrest Plaintiff. Kaiser therefore is not entitled to qualified immunity on Plaintiff's claim that he arrested
     her for trespassing without probable cause.

1   'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the

2   inferences it draws therefrom"). Accordingly, the Court DENIES Defendants' motion for summary

3   judgment on the ground they are entitled to qualified immunity from Plaintiff's claims.

4   **D.      Punitive Damages.**

5   Punitive damages may be awarded in a § 1983 case where a defendant acts with malice toward

6   the plaintiff. *See Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005); *Smith v. Wade*, 461 U.S. 30, 56

7   (1986). Because genuine issues of material fact exist as to whether Defendants acted maliciously toward

8   Plaintiff, the Court DENIES Defendants' motion for summary judgment on Plaintiff's request for

9   punitive damages.  For trial, counsel can count on this aspect of the case will be bifurcated, only to be

10  addressed if the jury first makes the requisite findings.

11  **V. <u>CONCLUSION AND ORDER</u>**

12  For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment in its

13  entirety.

14  IT IS SO ORDERED.

15  Dated:   **April 23, 2015**                         **/s/ Lawrence J. O'Neill**
                                                      UNITED STATES DISTRICT JUDGE

26